7 F.3d 936
 27 Fed.R.Serv.3d 685
 Dewayne FRY, Luella Fry, Dallas Fry and Lisa Fry,
Plaintiffs-Appellants and Cross-Appellees,
v.
The BOARD OF COUNTY COMMISSIONERS OF the COUNTY OF BACA,
STATE OF COLORADO; Donald E. Self, in his official capacity
as a member of the Board of County Commissioners of the
County of Baca, and as an individual; Roy Brinkley, in his
official capacity as a member of the Board of County
Commissioners of the County of Baca, and as an individual;
Harold Smith, in his official capacity as a member of the
Board of County Commissioners of the County of Baca, Richard
Leo Turner, Johnny B. Boaldin, and Verne E. Moore,
Defendants-Appellees and Cross-Appellants.
 Nos. 92-1091, 92-1138 and 92-1143.
 United States Court of Appeals,
Tenth Circuit.
 Oct. 14, 1993.
Rehearing Denied Nov. 15, 1993.
 
 1
 Russell O. Stewart (Joseph M. Montano, and Leslie A. Fields, with him on the brief), Faegre & Benson, Denver, CO, for plaintiffs-appellants.
 
 
 2
 Steven J. Dawes (Paul E. Collins, with him on the brief), Greengard Senter Goldfarb & Rice, Denver, CO, for defendants-appellees.
 
 
 3
 Michael T. Mitchell, Parker, CO, for defendants-appellees Richard Leo Turner, Johnny B. Boaldin and Verne E. Moore.
 
 
 4
 Before TACHA and BARRETT, Circuit Judges, and BROWN, Senior District Judge.*
 
 
 5
 WESLEY E. BROWN, Senior District Judge.
 
 
 6
 This civil rights action arose from the efforts of the Fry family to open a section line service road along land which they own or occupy in Baca County, Colorado. The defendant-appellees are the Baca County Board of County Commissioners, its individual commissioners Self, Brinkley, and Smith, in their official capacities, and three landowners in the area, Turner, Boaldin and Moore. Commissioners Brinkley and Smith were also named as defendants in their individual capacities.[1]
 
 
 7
 In this action plaintiffs claim the right to damages and injunctive relief under 42 U.S.C. § 1983. The Frys alleged that the defendant commissioners and landowners jointly conceived and executed a plan to vacate the road in question in retaliation for plaintiffs' exercise of First Amendment rights, and in violation of their rights to due process and equal protection of the laws.
 
 
 8
 Prior to trial, the district court granted summary judgment in favor of the commissioners on claims asserted against them as officials, and as individuals. 837 F.Supp. 330. A jury trial began March 2, 1992, and on March 9, the district court entered a final judgment dismissing all remaining claims against all remaining defendants, pursuant to Rule 50, Fed.R.Civ.P.[2] The court also denied defendant motions for attorney fees and costs.
 
 
 9
 In this appeal the Frys contend that the district court erred in concluding that there was insufficient evidence to establish that they were deprived of a constitutional right, or for the jury to find that defendant landowners acted under color of state law. They also claim that the court erroneously concluded that plaintiffs' claims were barred by collateral estoppel, that the defendant commissioners sued in their individual capacities were entitled to absolute immunity, and that the plaintiffs Lisa and Dallas Fry lacked standing to complain of any direct injury to their constitutional rights.
 
 
 10
 In cross appeals, the defendants contend that they are entitled to fees and costs under 42 U.S.C.A. § 1988.
 
 
 11
 The standard of review of the court's order sustaining the motion for directed verdict under Fed.R.Civ.P. Rule 50 is de novo, applying the same rule applied by the district court. Rajala v. Allied Corp., 919 F.2d 610, 615 (10th Cir.1990), cert. den. --- U.S. ----, 111 S.Ct. 1685, 114 L.Ed.2d 80. The question then is whether there was evidence upon which the jury could return a verdict against defendants.
 
 
 12
 In order to evaluate this issue, we have reviewed the undisputed facts which appear in the record.
 
 
 13
 Under the name Fry Land & Cattle Company, plaintiffs Dewayne and Luella Fry own approximately 4,930 acres of land in Cimarron County, northern Oklahoma, which runs along the boundary line of the state of Colorado. A part of this land is irrigated and used to grow alfalfa, wheat, and cattle feed, and the rest is used for grazing. In April, 1985, the Frys signed a contract to buy the SW 1/4 of Section 5 and the W 1/2 of Section 8, Township 35 South, Range 41 West in Baca County, Colorado, and the land was conveyed to them on February 11, 1986. Dewayne Fry and his wife live on the Oklahoma land, and their son Dallas Fry and his wife, Lisa Fry, live on the Colorado land. Dallas and Lisa Fry have no ownership interest in the Colorado land.
 
 
 14
 When the Frys purchased the land, there was no established road directly connecting the Colorado land to the Oklahoma farming operations. Most of the Fry farming equipment is stored in Oklahoma and transported to the Colorado land as needed.
 
 
 15
 No roads cross the Cimarron River in this part of Baca County, known as the "cut-off," and the area is sparsely populated with only two "full-time" residents. Nonresidents do own land and actively farm in that area, however, and many of them live over the Colorado line in Morton County, Kansas.[3]
 
 
 16
 The Frys do have access to the Colorado land along County Road No. 57, which extends east from Frys' Colorado land about 2 miles, and then moves south to the Oklahoma line, then east again along the Colorado/Oklahoma and Kansas/Oklahoma borders, then south along the Cimarron County/Texas County Oklahoma line, then back west about 5 miles to Frys' Oklahoma headquarters. The distance along this route is 12.3 miles. (Vol. VII Appellants' Appendix, p. 1614).
 
 
 17
 Shortly after the Colorado purchase, the Frys began an effort to establish a road along section lines from their operation in Oklahoma directly to the Colorado land. If this road had been opened, the travel distance between the two properties would have been 5.2 miles.
 
 
 18
 In September, 1985, the Frys were advised that the Baca County Commissioners would not allow the road to be opened without the consent of affected landowners. On October 31, 1985, Dewayne Fry filed an action in the Baca County District Court against the Board of County Commissioners. Fry v. Board of Commissioners et al., Case No. 85 Civ. 79. In this case, Fry sought a declaratory judgment that a resolution, passed by the county board in 1911, had already designated all section lines in Baca County as county roads, thus creating a roadway connecting the two farms. In January, 1986, that complaint was amended to add as additional party defendants the three landowners who are defendants here, Johnny B. Boaldin, Richard Turner, and Verne Moore.[4]
 
 
 19
 Apparently, before 1985, the Frys had generally good relationships with the defendant landowners, but this amity ceased soon after they purchased the Colorado land. In July, 1985, Dewayne and Luella Fry sued defendant Moore and his wife in the District Court of Cimarron County, Oklahoma, alleging that they had breached an agreement to give the Frys a right of way across Section 18 in Baca County, Colorado.[5] Defendant Turner had wanted to purchase the Colorado farm and felt "betrayed" when the Frys outbid him for the property in 1985. Turner believed that the Frys owed him about $20,000 through trades for wheat seed and hay over several years. The Frys and Turner had had a dispute over a new gas pipeline that Turner wanted to build in November, 1985; and Turner shut off and dug up the gas valve (which was on his property) so the Frys could no longer hook into it. Defendant Boaldin is defendant Moore's stepson. He was upset when the Frys sued the Moores. Boaldin also felt that Fry owed him money for cutting wheat in 1974-75, and there was a dispute between them over a fence and a survey. Boaldin felt that Fry owed him about $1,700. Boaldin also maintained a fence on the section line in question.
 
 
 20
 On April 30, 1986, several individuals, including the defendants Turner, Boaldin, and Moore, filed a petition with the Baca County Board of Commissioners, in which they sought to vacate approximately 40 miles of section line roads throughout Baca County, including the section line road which the Frys proposed to use as an access to their Colorado property.[6] On July 7, 1986, the county commissioners adopted a resolution denying the petition to vacate the roads.[7]
 
 
 21
 Meanwhile, during the summer of 1986, a heated election campaign was conducted when defendant Don Self ran for re-election as a county commissioner. Written articles concerning the section line roads were published in local newspapers, and petitions were circulated in the county by the Frys and others opposing the re-election of Self, and by the defendant landowners and others supporting his re-election. The commissioners were angry over statements made by the Frys, and the defendant landowners discussed the newspaper articles with Commissioners Self and Brinkley, stating that they believed the articles were defamatory.[8] On August 12, 1986, Commissioner Self was declared the winner of the primary election.
 
 
 22
 On November 13, 1986, the state district court issued an order granting partial summary judgment in Case No. 85CV79 in favor of Dewayne Fry. The court declared that a public highway existed 30 feet on either side of the section lines in Sections 17 and 18, and Sections 7 and 8 along Fry's property, as well as 30 feet along Section 18, north of the state line. The order restrained all defendants from interfering with the use of the highway by Fry and the public and required the defendant landowners to remove all fences they had constructed along the highway.[9] Prior to this time, the road had been bladed by the plaintiffs; and on November 13, 1986, they began using the route.
 
 
 23
 On December 18, 1986, landowners Turner, Moore, and Boaldin filed a second petition with the Baca County Commissioners to vacate about 3 1/2 miles of section line roadways.[10] On December 31, there was a public hearing on the petition, and on that date a resolution vacating the roadways was adopted by the board. This was a 2-to-1 decision, since Commissioner Smith voted not to vacate the road.[11]
 
 
 24
 In support of this action, the board made these specific findings: (Vol. IV, Appellants' Appendix, pp. 753, 754):
 
 
 25
 1. In the past, when landowners could not agree on whether a County road should be built, the Board has attempted to follow the will of the majority of the affected landowners.
 
 
 26
 2. In this case, the majority of the affected landowners oppose the proposed roadways.
 
 
 27
 * * * * * *
 
 
 28
 5. The proposed road is located in an area of sandy soil and construction of a road in that location will result in soil erosion problems or considerable expense in surfacing the road or both.
 
 
 29
 6. Sufficient public need for the proposed road has not been demonstrated to justify the cost, which would have to be borne by the taxpayers of Baca County.
 
 
 30
 7. Dewayne Fry's offer to build and maintain the proposed road does not relieve the County of potential liability to third parties who might use the road or be affected by its construction and maintenance.
 
 
 31
 8. There is sufficient public access to all property described in the Petition to Vacate so that no property owner will be denied access to his property.
 
 
 32
 9. The public interest will be served by granting the Petition.
 
 
 33
 10. CRS 43-2-303 empowers the Board to vacate "any roadway or any part thereof located entirely within said County if such roadway is not within the limits of any city or town."
 
 
 34
 * * * * * *
 
 
 35
 After this decision by the board, and in January, 1987, the Frys filed a second suit in the District Court of Baca County complaining of various state and federal constitutional deprivations as well as an inverse condemnation claim. Fry v. Board of County Commissioners, Case No. 87CV4. In this action, the Frys challenged the propriety of the board hearing and alleged that the board's actions were unconstitutional.
 
 
 36
 While this second state action was pending, and on October 31, 1988, Dewayne and Luella Fry filed this federal action under 42 U.S.C.A. § 1983, complaining of the denial of constitutional rights.[12] On March 3, 1989, the federal district court entered an order denying the landowners' motion to dismiss and administratively closed the federal action, pending the outcome of the state court proceedings.
 
 
 37
 In December, 1990, the state court in Case No. 87CV4, ruled that the vacation of the roadway between Sections 7 and 8, and 18 and 17, was not a compensable unlawful taking of plaintiffs' property under the authority of Dept. of Highways v. Interstate-Denver, 791 P.2d 1119 (Colo.1990). In the Interstate-Denver condemnation case, the Supreme Court of Colorado en banc ruled that a landowner's right of access was not "substantially impaired" when one of two access points to a public street was taken by condemnation.[13]
 
 
 38
 In so ruling, the Baca County court noted that three quarter sections of the Colorado land were irrigated by three separate sprinkler systems, that there was a small feed lot for cattle, and that most of the land was planted with alfalfa, grown for use in a feed lot located in Oklahoma. The court found that plaintiffs would travel about an additional 70 to 80 miles round trip with haying equipment each growing season, but that this distance was not unusual in the area for farming operations.[14] While plaintiffs alleged that they sustained damages because one of the landowners had closed a natural gas valve on his property thereby shutting off gas to the Fry land and increasing irrigation fuel costs, the state court found that any damages arising from this was caused by the landowner closing the valve and not caused by the vacation of the roadway.[15]
 
 
 39
 The findings and conclusions of the Baca County District Court were affirmed on appeal. Fry v. Board of County Commissioners et al, Case No. 91CA0097, Colorado Court of Appeals, February 20, 1992. In so ruling, the appellate court stated:
 
 
 40
 Landowners are not always entitled to compensation when one point of access to their property is denied; they must suffer a substantial impairment of access for their injury to be compensable. Moreover, substantial impairment of access does not necessarily occur even when a landowner's point of access to a particular road is completely taken. State Department of Highways v. Interstate-Denver West, 791 P.2d 1119 (Colo.1990). If the vacation of a roadway results in nothing more than an inconvenience to the plaintiffs, and they still have ingress and egress to their property, then they have suffered no greater loss than the general public and are not entitled to damages ... That is the case here. (p. 1874, Defendants-Appellees Appendix)
 
 
 41
 The Colorado Court of Appeals also affirmed the Baca County Court's finding that the proceedings before the county commission were proper in all respects.[16] The appellate court noted that the petition to vacate the roadways was discussed in open meeting, and that the county attorney's actions were proper:
 
 
 42
 ... there is no evidence in the record of undue influence or coercion by the county attorney to persuade the commissioners and affect the outcome of the meeting. Hence, we agree with the district court that there was no procedural irregularity or inappropriateness that would compel us to declare the resolution invalid.
 
 
 43
 After the state court decision, the federal case was reopened; and on November 6, 1991, the federal district court denied the landowners' motion to dismiss but granted summary judgment for the commissioners upon a finding that they were entitled to absolute legislative immunity for their actions.
 
 
 44
 Under the evidence discussed above, the defendant commissioners were entitled to summary judgment. In Tenney v. Brandhove, 341 U.S. 367, 71 S.Ct. 783, 95 L.Ed. 1019 (1951), plaintiff was required to testify before a California legislative committee; and he thereafter sued members of the committee for damages under civil rights statutes, alleging that the members had deprived him of federal constitutional rights. Plaintiff claimed that the legislative hearing was not held for a legislative purpose but was designed to intimidate him and deter him from his right to free speech and to petition the legislature. In ruling that since defendants were acting in their legitimate legislative capacity they were immune from liability, the Supreme Court discussed the reason for immunity in these terms:
 
 
 45
 Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators. The privilege would be of little value if they could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives. The holding of this Court in Fletcher v. Peck (US) 6 Cranch 87, 130, 3 L ed 162, 176, that it was not consonant with our scheme of government for a court to inquire into the motives of legislators, has remained unquestioned.
 
 
 46
 * * * * * *
 
 
 47
 Legislative committees have been charged with losing sight of their duty of disinterestedness. In times of political passion, dishonest or vindictive motives are readily attributed to legislative conduct and as readily believed. Courts are not the place for such controversies. Self-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses. The courts should not go beyond the narrow confines of determining that a committee's inquiry may fairly be deemed within its province.... (341 U.S. at 377-378, 71 S.Ct. at 788-789, 95 L.Ed. 1027-1028).
 
 
 48
 In ruling that the commissioners were entitled to immunity, the district court here found several indications that the "legislative process was at work" and that the resolution vacating the roads was clearly a legislative act. Under Colorado law, the Commission clearly had the power to vacate the roads. LeSatz v. Deshotels, 757 P.2d 1090 (Colo.App.1988); Sutphin v. Mourning, 642 P.2d 34 (Colo.App.1981). Here, the highway issue was a subject of wide public interest and debate, and the decision to vacate was made following an open public meeting in which all parties were heard. As the trial court found,
 
 
 49
 "(v)alid reasons existed for the action taken by the commissioners, and the action taken in vacating the roadway was not pretexual; the action taken by and the reason given by the commissioners, and the court's opinion was not a facade. They were not a subterfuge for their alleged reasons for harming the Frys. We find that there was a legitimate governmental reason within their power to take the action in vacating the roadway."
 
 
 50
 Because legislative immunity is absolute, any individual motive which may have guided a commissioner is irrelevant.
 
 
 51
 While the district court allowed plaintiffs to present their evidence to the jury, the court directed a verdict in favor of defendants upon a finding that plaintiffs had failed to present sufficient evidence to support their claims of constitutional violations.[17] Under the evidence discussed above, the directed verdict was properly entered.
 
 
 52
 The trial court observed that while there were numerous telephone calls between the landowners and the commissioners, this was not evidence of improper influence since the landowners as citizens had the right to voice their opinions to their elected officials. As citizens, they had the right to file their petition to vacate the section line roads; and, as "affected landowners," the commissioners were certainly required to consider their objections and concerns about the roads and the damage they might do to their croplands. Here, there was no evidence of improper collusion to show that the landowners improperly "acted under state law" to deprive plaintiffs of their constitutional rights. The evidence only shows "that the landowner defendants opposed the opening of a roadway on their property, petitioned the board to vacate the designated road along the section lines," and that they were successful in persuading two of the commissioners to vote in favor of their petition. Under these circumstances, the trial court properly found that "the fact that the position supported by the landowner defendants ultimately prevailed does not give right to a claim that a collusive or joint agreement was reached with the commissioners, or even a suspicion that there was a collusive or joint agreement reached with the commissioners."[18]
 
 
 53
 Because plaintiffs failed to provide sufficient evidence of an unlawful conspiracy under § 1983 in deprivation of their constitutional rights, the order of the district court directing judgment in favor of all defendants will be affirmed.[19]
 
 
 54
 The award of fees in a civil rights case lies within the sound discretion of the trial court under 42 U.S.C. § 1988.[20] See Iqbal v. Golf Course Superintendents Ass'n of America, 900 F.2d 227, 228 (10th Cir.1990); Nephew v. City of Aurora, 830 F.2d 1547 (10th Cir.1987), cert. den. 485 U.S. 976, 108 S.Ct. 1269, 99 L.Ed.2d 481. The 10th Circuit has ruled that fees may be awarded when claims are "frivolous, unreasonable or groundless." See Crabtree v. Muchmore, 904 F.2d 1475 (10th Cir.1990). The court should not use hindsight in determining a fee question since this would discourage "all but the most airtight claims ... seldom can a prospective plaintiff be sure of ultimate success ..." Christiansburg Garment Co. v. EEOC, 434 U.S. 412, 422, 98 S.Ct. 694, 700, 54 L.Ed.2d 648, 657.
 
 
 55
 In denying fees to the landowners and the board, the trial court found that while their numerous pretrial motions for dismissal had been denied, the insufficiency of plaintiffs' evidence did not become clear until all of their case was presented.
 
 
 56
 The board of commissioners claims that it is entitled to additional costs because a comprehensive offer of judgment was made to plaintiffs under Rule 68, Fed.R.Civ.P., which provides in pertinent part that:
 
 
 57
 At any time more than 10 days before the trial begins, a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party for the money or property or to the effect specified in the offer, with costs then accrued ... If the judgment finally obtained by the offeree is not more favorable than the offer, the offeree must pay the costs incurred after the making of the offer.... (Emphasis supplied)
 
 
 58
 The total amount offered to the plaintiffs by the board was $7,500 to cover all claims, attorney fees, and costs. Plaintiffs did not accept this offer.
 
 
 59
 As properly noted by the district court, Rule 68 is limited to cases in which the offeree--in this case, the plaintiffs--prevails, but the amount recovered is less than the offer. See Delta Air Lines, Inc. v. August, 450 U.S. 346, 351, 101 S.Ct. 1146, 1149, 67 L.Ed.2d 287, 292-293 (1981), which held that Rule 68 does not apply to judgments obtained by the offeror, in this case, the board of commissioners. The district court, and this court, are bound by the ruling in Delta Air.[21]
 
 
 60
 Under the circumstances of this case, the district court did not abuse its discretion in declining to award attorney fees and additional costs to defendants.
 
 
 61
 For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 *
 Honorable Wesley E. Brown, United States District Senior Judge for the District of Kansas, sitting by designation
 
 
 [1]
 Defendant Richard Turner died during the pendency of this appeal after he had placed all of his assets in an irrevocable living trust. There will be no probate proceedings in his estate
 Under the provision of Fed.R.App.P. 43, when a deceased party has no representative, proceedings shall continue as the court of appeals may direct. Accordingly, these combined appeals shall progress without the substitution of any party to represent the estate of Richard Turner.
 
 
 [2]
 Rule 50(a) provides in pertinent part that "(i)f during a trial by jury a party has been fully heard with respect to an issue and there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue, the court may grant a motion for judgment as a matter of law against that party on any claim ... that cannot under the controlling law be maintained without a favorable finding on that issue."
 A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.
 
 
 [3]
 Commissioner Self testified that he personally inspected the area in controversy, and found that: "... I just felt like the sagebrush and the sand and like that would cost a lot of money for the county. And then I don't see that there would be anybody wanting to travel that country out through there ... There's no place to go out there. It's either Johnny Boaldin's or Richard Turner's or Vernon Moore's or Dallas's and DeWayne's. There's nothing to see out there expect (sic) sagebrush and grass. There's no water, there's no fishing holes, there's nothing there to see other than grassland." Plaintiffs Appendix Vol. II pp. 318-319
 Dan Witcher, of Morton County, Kansas, ran a "cow/calf" operation in Baca County where he owned approximately 40 sections of land in the cut-off area. He testified that he bought the property because it was isolated and without roads. Mr. Witcher was originally a defendant in this action, but was dismissed as a party by stipulation.
 The defendant landowners were all residents of Elkhart, Morton County, Kansas. Plaintiff's Exhibit 14, Vol. IV Appellants' Appendix, at p. 602, and p. 720.
 
 
 [4]
 Plaintiffs Supplemental Index, p. 1986. It appears that in Baca County, Colorado, defendant Turner owns or leases all or parts of sections 4, 5, 6, 7, 8 and 32; defendant Moore owns or leases all or parts of sections 7, 12, 13, 14, and 18; and that defendant Boaldin owns or leases all or parts of sections 14, 15 and 16 in Cimmaron County, Oklahoma, and sections 9, 16, and 17 in Baca County, Colorado
 
 
 [5]
 Mr. Moore admitted that he had initially agreed to give Fry an easement for a gas line, but later changed his mind. The Frys dismissed this suit without prejudice on September 18, 1985
 
 
 [6]
 Boaldin testified that they asked that 40 miles of roads be vacated because they were disturbed over the 1911 resolution, and they "didn't like the idea that anybody could drive any section line through our pasture land at will." Plaintiffs' Appendix Vol. II, p. 432
 
 
 [7]
 P. 1830, Defendants' Appendix:
 "... the Petition to Vacate Roadways is denied for the reason that the Board continues to maintain the legal position that the 1911 Resolution does not in and of itself designate sections lines as roadways or public highways ..."
 
 
 [8]
 One article, signed by Dallas and Lisa Fry, concerned the petition to close 40 miles of section lines "at the request of 23 people, 16 of whom are not even residents of Colorado, but are absentee land owners ..."
 
 
 [9]
 See Vol. V, p. 1042, Applts' Appendix. Following a hearing, the state court had granted a preliminary injunction on April 11, 1986. The resolution adopted by the board of county commissioners in 1911 declared that all township and section lines in Baca County "shall be public highways of the width of sixty feet."
 The defendant landowners were maintaining fences within the highway right of way, and after the state court decision they were required to remove them.
 
 
 [10]
 Dan Witcher and his wife, who also signed this petition, later withdrew their endorsement
 
 
 [11]
 At the time of trial, Mr. Smith, who had been dismissed from the case, was deceased and his testimony was presented to the jury by way of deposition. Applt. Appendix Vol. II, pp 406, et seq
 He testified that he voted against the resolution "Because I just don't like to vacate any section line. That's my position and that was my position, always has been, you know. I don't, you know--don't like to do it." Ibid at p. 410.
 
 
 [12]
 On October 30, 1991, the plaintiffs filed a motion to file an amended complaint in the federal action adding Dallas and Lisa Fry as plaintiffs. On November 6, 1991, this motion was granted
 
 
 [13]
 The Baca County District Court initially had relied on the court of appeal's decision in the Interstate-Denver case, which held that a landowner was entitled to damages per se when access to his land was taken. See Dept. of Hwys. v. Interstate-Denver West, 772 P.2d 649 (Colo.App.1988). Since that case was reversed by the Colorado Supreme Court, the Baca County Court re-examined the issue to determine whether or not the vacation of Frys' roadway constituted a taking as a matter of law by "substantially interfering with the landowners means of ingress or egress."
 
 
 [14]
 It was found that the equipment used by the Frys was located in Oklahoma, a distance of 5.2 miles from the Colorado property if section line roads were used, while the travel distance for the existing route would be 12.3 miles. The 70- to 80-mile figure mentioned by the court was based upon a finding that the Frys could reasonably expect 4 to 5 cuttings of alfalfa during a season, which required the hauling of swathing, stacking, and fertilizing equipment to the Colorado land
 
 
 [15]
 While the Frys contended that they could use the section line roads to lay their own line from gas wells located on their Oklahoma property, the state court properly noted that any such use of the vacated road would be contingent upon obtaining permits and possibly easements from adjoining landowners
 
 
 [16]
 Plaintiffs alleged that the commissioners had violated the "open meeting" laws of the state of Colorado, thereby rendering the resolution vacating the roadways null and void. They also complained that the county attorney had improperly participated in the commission's decision-making process
 
 
 [17]
 Previously the court, applying the rule of liberal construction, had denied the landowners' motion for summary judgment and the board's motion to dismiss under Fed.R.Civ.P. 12(b)
 
 
 [18]
 The trial court noted that the actions of the Frys here might "actually chill the rights of citizens or the landowners in petitioning the government.... the activity of retribution by or retaliation by filing a lawsuit, if you lose a vote before a city council ... has horrendous ramifications"
 
 
 [19]
 Because of this disposition of the case, we do not address the issues involving the limitation of evidence on damages and the standing of Dallas and Lisa Fry to maintain their action
 
 
 [20]
 Section 1988 provides in pertinent part that "the court, in its discretion, may allow the prevailing party ... a reasonable attorney's fee as part of the costs."
 
 
 [21]
 The Delta Air decision has been criticized, but its holding remains the law. See, e.g. Landon v. Hunt, 938 F.2d 450, n. 1, 451-452 (3rd Cir.1991); Hopper v. Euclid Manor Nursing Home, Inc., 867 F.2d 291, 293 (6th Cir.1989)
 The district court here noted that perhaps Rule 68 would become more effective if a non-prevailing party were subjected to the rule, but two proposed amendments that would have expanded its scope, effectively overruling Delta Air, were not enacted.