**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 24, 2009**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DONALD SABLE II,

        Plaintiff - Appellee,

    v.

STEWART E. MYERS, JR.,
individually; R GREGG RAWLS,
individually; JOHN A. LIPPERT;
KATHY WALBERT WALKER,
individually,

        Defendants - Appellants,

and

CITY OF NICHOLS HILLS, a
municipal corporation,

        Defendant.

No. 07-6286

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF OKLAHOMA**
**(D.C. NO. 5:03-cv-00643-W)**

---

Robert S. Lafferrandre (Andrea D.W. Moates, with him on the brief), of Pierce,
Couch Hendrickson, Baysinger & Green, L.L.P., Oklahoma City, Oklahoma, for
Defendants - Appellants.

Rand C. Eddy (Sherri Carver, with him on the brief), of Eddy Law Firm, P.C.,
Oklahoma City, Oklahoma, for Plaintiff - Appellee.

---

Before **LUCERO**, **EBEL**, and **HARTZ**, Circuit Judges.

**HARTZ**, Circuit Judge.

Donald E. Sable II alleges that the City Council of the City of Nichols Hills, Oklahoma, sought to condemn his property in retaliation for his having brought a successful quiet-title suit against the City. He sued the City and several councilors under 42 U.S.C. § 1983. The councilors argued that legislative immunity protected them from suit. The district court disagreed and the councilors (Defendants) appeal. We have jurisdiction under 28 U.S.C. § 1291, *see Mitchell v. Forsyth*, 472 U.S. 511, 525 (1985) (denial of absolute immunity is immediately appealable), and reverse.

## I.     BACKGROUND

### A.     Quiet-Title and Condemnation Proceedings

In 1995 Mr. Sable purchased a parcel of property immediately north of a City public-works facility. The parcel occupied about two city blocks. Fenced in with the parcel on its southern border was a 33-foot-by-290-foot strip (the Strip) that had been the south half of a City street that ran east to west. The street was vacated in 1976, and apparently title to the vacated land was split down the middle, with ownership of each half going to the adjoining property owner, so that the Strip reverted to the City. According to Mr. Sable, however, his predecessors in title had taken possession of the Strip and kept it continually

fenced in since 1972, giving him ownership of the Strip through adverse possession.

In 1997 the City informed Mr. Sable that it wanted to use the Strip to expand its public-works facility. The City planned to move the fence from the north border of the facility to the north border of the Strip and insisted that Mr. Sable remove his possessions from the Strip. When Mr. Sable and the City were unable to reach an agreement, the three-member City Council unanimously voted to move the fence as planned. Two of the Defendants, then-Mayor Stewart E. Meyers Jr and Councilor R. Gregg Rawls, were on the Council at the time.

Soon thereafter Mr. Sable filed suit against the City and the members of the Council (Meyers, Rawls, and Vice Mayor Dr. Warren L. Felton[1]) in Oklahoma state court to quiet title to the Strip. After the court granted the City summary judgment, the Oklahoma Court of Civil Appeals reversed and remanded for rehearing, and the state supreme court denied certiorari in January 2000. Back in state district court Mr. Sable sought leave to amend his quiet-title petition to allege a conspiracy by the defendants and seek damages and ejectment. The court granted leave on March 30, 2001.

A few weeks after the state court granted Mr. Sable's motion to amend, the City Council began the process of condemning his entire parcel of land (not just

---

[1]Felton is not a party in this case. A district-court pleading asserts that he is deceased.

the Strip).  On April 24, 2001, it held a special meeting at which it approved a resolution "declaring the necessity for acquiring and owning certain real property . . . , a portion of which is also known as 7701 North Classen Boulevard [Mr. Sable's parcel], and authorizing the acquisition of the property by exercise of the power of eminent domain."  Aplt. App. Vol. I at 245.  Once again, Meyers and Rawls voted in favor.  Before the vote the Council discussed its power to acquire Mr. Sable's property even if he did not want to sell it:

> VICE-MAYOR FELTON:  But in any case, could we acquire [Mr. Sable's land], though?  I mean, if [Mr. Sable] didn't want to sell it?
>
> JOHN WILLIAMS[a private attorney apparently retained by the City]:  Yes, we can.
>
> VICE-MAYOR FELTON:  Just because of where it's sitting, and why we want it?
>
> CITY ATTORNEY MOLER:  That's right.  If it's for a public purpose—

*Id.* Vol. III at 872.  At that point, as we understand the transcript of the meeting, various conversations began simultaneously.  But one exchange (on which Mr. Sable relies to show Defendants' improper motive) was recorded:

> COUNCILMAN RAWLS:  . . . There's none.
>
> VICE-MAYOR FELTON:  It's good to be King.

*Id.*

At a meeting on June 25 the City Council passed another resolution authorizing the City's use of eminent-domain power to acquire Mr. Sable's entire property, this time also authorizing negotiations with Mr. Sable to determine what he would be paid. Mr. Sable rejected the City's June 26 offer of $378,995, a figure based on an appraisal obtained by the City. In July 2001 the City filed a condemnation action in state court, alleging that Mr. Sable's property was needed to facilitate the City's expansion of its public-works facility.

While the condemnation action was pending, the state court hearing Mr. Sable's quiet-title action granted partial summary judgment in favor of Mr. Sable, determining that he had ownership of the Strip through adverse possession. The issue of damages was deferred.

Negotiations between Mr. Sable and the City continued without success. In December 2002 the City Council—which now included Meyers, Rawls, and Defendant Councilor John A. Lippert—voted again "to offer to purchase Mr. Sable's property at fair market value." *Id.* Vol. I at 262. But, again, no agreement was reached.

On April 23, 2003, Mr. Sable filed in state court the suit before us. In September 2003, after a two-year hiatus in the condemnation suit, the City filed in that suit a motion to begin the process of appraising Mr. Sable's property. Angered, Mr. Sable wrote a letter to Lippert and Defendant Kathy Walbert Walker, a new City Council member, demanding that they "submit a motion to the

Council . . . to withdraw the condemnation action and to have the case dismissed with prejudice." *Id.* Vol. II at 420. He threatened that if they did not comply, he would "instruct [his] attorneys to immediately . . . add your . . . names to the list of Defendants" in the civil-rights suit filed in April 2003. *Id.*

The condemnation action proceeded anyway. Eventually, the trial court, affirmed by the Oklahoma Court of Civil Appeals, upheld the condemnation as having a public purpose—namely, to meet the City's ongoing water-treatment needs. The Oklahoma Supreme Court denied Mr. Sable's petition for certiorari.

### B. Federal-Court Proceedings

The suit before us was originally filed in state court, but was removed to the United States District Court for the Western District of Oklahoma on May 13, 2003. Councilors Lippert and Walker were added as Defendants in April 2004.

Mr. Sable's complaint contained the following claims: (1) a damages claim under 42 U.S.C. § 1983 alleging that the condemnation action was retaliation in violation of his First Amendment right to petition the government for redress, his due-process rights, his equal-protection rights, and his right of access to the courts under the Privileges and Immunities Clause; (2) a § 1983 damages claim alleging a conspiracy to retaliate against him for exercising his constitutional rights; (3) a state-law abuse-of-process claim; and (4) a state-law claim for intentional interference with prospective economic advantage.

The district court granted Defendants' motion to dismiss Mr. Sable's conspiracy claim and the access-to-courts component of his § 1983 claim. Defendants also filed summary-judgment motions. With respect to Mr. Sable's remaining § 1983 claims, Defendants raised, among other defenses, absolute legislative immunity. The district court rejected all the defenses, and Defendants appeal.

## II.   DISCUSSION

"Absolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) (internal quotation marks omitted). Immunity is not limited to members of Congress and state legislators, but extends to local-government legislators. *See id.* at 49; *see also Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 734 (1980) (recognizing immunity for state judges acting in legislative capacity). It applies, however, only to legislators sued in their individual capacities, not to the legislative body itself. *See Minton v. St. Bernard Parish Sch. Bd.*, 803 F.2d 129, 133 (5th Cir. 1986) ("[A]bsolute legislative immunity [is a] doctrine[] that protect[s] individuals acting within the bounds of their official duties, not the governing bodies on which they serve.").

Legislative immunity enables officials to serve the public without fear of personal liability. Not only may the risk of liability deter an official from proper action, but the litigation itself "creates a distraction and forces legislators to

divert their time, energy, and attention from their legislative tasks to defend the litigation." *Supreme Court of Va.*, 446 U.S. at 733 (brackets and internal quotation marks omitted). "Legislators are immune from deterrents to the uninhibited discharge of their legislative duty, not for their private indulgence but for the public good. One must not expect uncommon courage even in legislators." *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951). Given this purpose, whether there is immunity must "turn[] on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54. As explained in *Tenney*, "The privilege would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." 341 U.S. at 377.

The Supreme Court has recognized legislative immunity for acts beyond just voting on legislation. *Tenney* concerned a challenge to a legislative-committee hearing investigating Communist activities. The California Senate Fact-Finding Committee on Un-American Activities subpoenaed William Brandhove to question him about a petition he had circulated. The petition accused the committee of conspiring with others to use him to smear a candidate for Mayor of San Francisco as a "Red." *See id.* at 369–70 (internal quotation marks omitted). The committee conducted a hearing at which some evidence contradicting Brandhove was admitted, but Brandhove refused to testify, resulting

in his criminal prosecution for contempt. *See id.* at 370–71. The charge was dropped, however, after a jury failed to agree on a verdict. *See id.* at 371. Brandhove then sued members of the committee for damages under § 1983, alleging that the hearing to which he was subpoenaed "'was not held for a legislative purpose,'" but to silence him, in violation of the United States Constitution. *Id.* The Supreme Court held that the legislators had been "acting in the sphere of legitimate legislative activity." *Id.* at 376; *see id.* at 379. Committee investigations, it said, "are an established part of representative government," *id.* at 377, and the committee had been "acting in a field where legislators traditionally have the power to act," *id.* at 379. The Court cautioned that judges should not lightly conclude that a legislative body has exceeded legislative power: "To find that a committee's investigation has exceeded the bounds of legislative power it must be obvious that there was a usurpation of functions exclusively vested in the Judiciary or the Executive." *Id.* at 378.

The Court took a similarly expansive view in *Bogan*, 523 U.S. at 44. The Court considered a city council's vote to adopt an ordinance eliminating a government office in which only one person, Scott-Harris, was an employee. *See id.* at 46–47. Scott-Harris filed a § 1983 claim against the city, the mayor (who had proposed and signed the ordinance), a city councilor, and others, alleging that the elimination of her position was retaliation for her complaining about racial slurs uttered by another government employee, who was politically connected to

members of the city council. *See id.* at 47. The Court held that the mayor and city councilor were protected by legislative immunity. It observed that the councilor's "acts of voting for an ordinance were, in form, quintessentially legislative," and that the mayor's "introduction of a budget and signing into law an ordinance also were formally legislative, even though he was an executive official[,] . . . because they were integral steps in the legislative process." *Id.* at 55 (citation omitted). As for substance, "the ordinance . . . bore all the hallmarks of traditional legislation." *Id.* The council had "governed in a field where legislators traditionally have power to act." *Id.* at 56 (internal quotation marks omitted). And the ordinance "reflected a discretionary, policymaking decision implicating the budgetary priorities of the city and the services the city provides to its constituents." *Id.* at 55–56. The Court explained that eliminating a position, "unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office." *Id.* at 56.

This circuit has followed the Supreme Court's broad view of legislative immunity. In *Fry v. Board of County Commissioners of County of Baca*, 7 F.3d 936 (10th Cir. 1993), we granted immunity to board members of a county commission with respect to a decision to vacate roadways. The Frys wanted to establish a road along section lines to link two different tracts of their land. *See id.* at 938. When the board denied the request, they brought suit in state court,

claiming that a 1911 commission resolution had already designated all section lines as county roads. *See id.* at 938–39. The state court agreed and ordered the removal of all fences that interfered with travel on the road desired by the Frys. *See id.* at 939–40. Allegedly prodded by landowners who were angry at the Frys, the board approved a resolution vacating about 3 1/2 miles of section-line roads in the county, including the route of the Frys' road. The Frys then sued the county commissioners under § 1983, alleging that the board's action was in violation of various constitutional rights. *See id.* at 937. Following *Tenney*, we held that the board members enjoyed legislative immunity. We noted that state law authorized the commission to vacate the road and that procedural formalities were followed. *See id.* at 942.

We recognize that this court refused to grant legislative immunity in *Kamplain v. Curry County Board of Commissioners*, 159 F.3d 1248 (10th Cir. 1998). But the context was quite different. At a public hearing of the county board of commissioners, Kamplain protested the board's decision to award a bid to a competitor of his employer. *See id.* at 1250. He was removed from the meeting and the board later decided to ban him from speaking at all future meetings. *See id.* Kamplain sued, alleging that the decision to ban him violated his First Amendment right to free speech. *See id.* We denied legislative immunity, observing that "[n]ot all actions taken at a legislative meeting by a local legislator are legislative for the purposes of immunity." *Id.* at 1251. The

-11-

decision to ban Kamplain from future meetings was not legislative "[b]ecause the circumstances of this case did not concern the enactment or promulgation of public policy," and thus were not "related to any legislation or legislative function." *Id.* at 1252. We wrote:

> The Board's decisions to ban [Kamplain] were simply efforts to monitor and discipline his presence and conduct at future Commission meetings. In voting to censure [Kamplain] and prevent him from disrupting future public meetings, the Board members were not voting on, speaking on, or investigating a legislative issue. Even though the Board may have acted during a "regularly scheduled meeting," we hold that the Board did not commit these acts in a legislative capacity; the acts were of an administrative nature.

*Id.* (footnote and citation omitted). We also rejected the defendants' alternative argument that the ban of Kamplain was legislative because "the Board acted in relation to the business of awarding bids . . . ." *Id.* We distinguished bid approval from legislative actions, noting that in the case of the former, "the Board applies known rules and legislation to make an administrative business decision." *Id.*

The case before us is unlike *Kamplain* and very similar to *Fry.* The decision to expand the public-works facility was neither an administrative matter (such as the conduct of a meeting) nor an essentially ministerial task (as when applying the law and predetermined criteria to select a bid). Oklahoma law authorizes municipalities to exercise the power of eminent domain to obtain land for public works. *See* Okla. Stat. tit. 11, § 22-104(3) (2008) ("Every municipality

-12-

shall have the right to . . . [e]xercise the right of eminent domain for any municipal purpose . . . ."); *id.* § 22-104(2) ("any municipal purpose" includes "public utility and public park purposes").  The City's decision to take Mr. Sable's land was undoubtedly an exercise of discretion regarding a matter of public policy that would impact the functioning of public services for years to come.  *See Bogan*, 523 U.S. at 55–56 (decision to eliminate one-person agency was "discretionary, policymaking decision implicating the . . . priorities of the city and the services the city provides to its constituents").  That the councilors may have exercised that discretion on the basis of motives that were irrelevant to public purposes does not affect the councilors' legislative immunity.  *See id.* at 54.  The effect of the decision on future government operations was likely greater than the vacation of undeveloped roads in *Fry* and certainly more significant than the elimination of a one-person office in *Bogan*.  Nor is there any question about the formalities of legislative action:  the decisions to proceed with condemnation were the products of formal votes.[2]  We would have to adopt a very restrictive view of what is "legitimate legislative activity," *id.* at 54 (internal quotation marks omitted), to deny immunity to Defendants.  In keeping with governing

---

[2]Mr. Sable also appears to be seeking relief against at least some of the Defendants for their *failure* to act—for not halting the condemnation proceedings.  Such failure to act, however, must also be protected by legislative immunity.  It would be strange public policy indeed to inform legislators that they are immune from liability if they decide to take action but not immune if they decide that action would be contrary to the public interest.

-13-

precedent, we refuse to do so. *See Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 634 (1st Cir. 1995) (observing that legislative-immunity doctrine has a "broad sweep").

Mr. Sable, quite naturally, focuses on the particularity of the City Council action in this case. The condemnation was directed specifically at him. There was, as he sees it, no general policy involved in this land grab, just one discrete, and despicable, act. Adoption of this perspective, however, would virtually eliminate legislative immunity in the § 1983 context. Almost every plaintiff will perceive the challenged conduct as a particular act directed at violating the plaintiff's rights. Brandhove viewed the California legislative committee's hearing not as a pursuit of public policy but as an attempt to silence him. *See Tenney*, 341 U.S. at 371. Scott-Harris viewed the elimination of her one-person office as retaliation for her complaints against racism. *See Bogan*, 523 U.S. at 47. And the Frys viewed the vacation of county roadways as retaliation for their exercise of First Amendment rights. *See Fry*, 7 F.3d at 937. The decisions in these cases teach us that we must consider such claims from a broader perspective than the specific complaint of the plaintiff. In general, legislative investigations, the elimination of public agencies, and the vacation of roadways are matters of public interest and legitimate legislative concern. Legislators should be able to make decisions in these areas without fear of lawsuits against them personally. So, too, for decisions to construct or expand public works.

-14-

We appreciate the discomfort that may arise from the recognition of legislative immunity in this case. Mr. Sable's allegations (whose truth has not been adjudicated) create an ugly picture of the abuse of public power to achieve improper ends. Perhaps such pettiness is more likely to arise in municipal legislative bodies than in legislatures with more members and broader jurisdiction. It is also true, however, that charges of improper motive are likely easier to bring at the local-government level. And the honor and fortune that come from service in local government are slight enough that many capable candidates for municipal office would surely forgo the rewards of such service if faced with the possibility of being sued for every decision taken without public consensus. *See Bogan*, 523 U.S. at 52 ("[T]he time and energy required to defend against a lawsuit are of particular concern at the local level, where the part-time citizen-legislator remains commonplace."). Moreover, those mistreated by municipal legislators are not without remedy. Not only are political remedies available, but a municipality, as opposed to its officials, is subject to suit under § 1983. *See id.* at 53. History has shown that the greater good comes from protecting legislators from suit based on their legislative acts. This conclusion may be little solace to one who perceives himself to be the victim of abuse of power. But perhaps it emphasizes each citizen's duty, for the public interest as well as one's own, to seek the election of honest, capable leaders, or even run for office oneself.

## III.  CONCLUSION

We REVERSE the district court's denial of summary judgment to the appellant Defendants with respect to the claims under 42 U.S.C. § 1983 against them in their individual capacities, and we REMAND for dismissal of those claims.