FILED
United States Court of Appeals
Tenth Circuit

March 10, 2026

Christopher M. Wolpert
Clerk of Court

**PUBLISH**

## UNITED STATES COURT OF APPEALS

## FOR THE TENTH CIRCUIT

_____

GAYS AGAINST GROOMERS, a
nonprofit corporation; ROCKY
MOUNTAIN WOMEN'S NETWORK,
an unincorporated association; RICH
GUGGENHEIM, an individual;
CHRISTINA GOEKE, an individual,

     Plaintiffs-Appellants,

v.

LORENA GARCIA, individually and
in her official capacity as a Colorado
State Representative; MIKE
WEISSMAN, individually and in his
official capacity as a Colorado State
Representative and Chair of the
House Judiciary Committee; LESLIE
HEROD, individually and in her
official capacity as a Colorado State
Representative; JULIE GONZALES,
individually and in her official
capacity as a Colorado State Senator
and Chair of the Senate Judiciary
Committee; DAFNA MICHAELSON
JENET, individually and in her
official capacity as a Colorado State
Senator,

     Defendants-Appellees.

No. 24-1473

_____

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:24-CV-00913-RMR)**

_____

Endel Kolde (Brett R. Nolan and Courtney Corbello with him on the briefs), of the Institute for Free Speech, Washington, D.C., for Plaintiffs-Appellants.

Edward T. Ramey (Martha M. Tierney with him on the brief), of Tierney Lawrence Stiles LLC, Denver, Colorado, for Defendants-Appellees.

_____

Before **CARSON**, **EBEL**, and **FEDERICO**, Circuit Judges.

_____

**FEDERICO**, Circuit Judge.

_____

For millennia, deliberative bodies across the world have set their own rules for debating matters of concern so that they may better affect the public business with "order, decency, and regularity." Thomas Jefferson, Manual of Parliamentary Practice 18 (Jonathan Phillips 1848).[1] Today, legislatures across the country are debating a matter of significant public interest – the rights of transgender persons – within these broad parameters. This appeal concerns not the substance of these debates, but rather their procedural rules, and whether a federal court may inquire into

---

[1] For a brief history of parliamentary practice, *see generally* George Demeter, Demeter's Manual of Parliamentary Law and Procedure 4–5 (Blue Book ed. 1969).

the lawfulness of those rules in a suit against legislators in their official capacity. We hold that it may not.

Gays Against Groomers, Rocky Mountain Women's Network, Rich Guggenheim, and Christina Goeke (together "GAG") sued Lorena Garcia, Mike Weissman, Leslie Herod, Julie Gonzales, and Dafna Jenet (together the "Legislators") in their individual capacities and official capacities as Colorado state legislators. GAG alleged that the Legislators violated their First Amendment rights by promulgating and enforcing rules of decorum that barred misgendering and deadnaming in legislative hearings. On legislative immunity and mootness grounds, the district court granted the Legislators' motion to dismiss GAG's complaint with prejudice and entered final judgment. GAG timely appealed and, exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

Our opinion will begin first by describing the public hearings before the Colorado General Assembly that led to this lawsuit. Second, we address our own jurisdiction and hold that this case is not moot and remains justiciable. Third, we hold that the Legislators are entitled to legislative immunity. We therefore do not reach the merits of GAG's constitutional claims.

# I

Because we review a district court's order dismissing the complaint under Federal Rule of Civil Procedure 12(b)(6), we borrow the facts from the complaint itself, taking the allegations as true and construing them in the light most favorable to the plaintiffs. *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 (10th Cir. 2007).

According to the complaint, misgendering "is the act of referring to others, usually through pronouns or form of address, in a way that does not reflect their self-perceived gender identity." J. App. at 24. For example, referring to a transgender man with feminine pronouns and honorifics would misgender him. Deadnaming "is the act of referring to a transgender person by a name they used prior to 'transitioning,' such as their birth name." *Id*. So, for example, referring to a transgender man named John Doe with his birth name Jane Doe would both deadname and misgender him. For people who are transgender, these practices can be deeply offensive, disrespectful, and perhaps discriminatory. For some other people, expectations or rules against misgendering or deadnaming offend their sincerely held belief that one cannot or should not hold a gender identity that is inconsistent with sex assigned at birth. J. App. at 17–18 (plaintiffs "personally reject transgender ideology"). These differing views converged

4

at the Colorado General Assembly as it considered House Bill 24-1071, also known as Tiara's Law.

Gays Against Groomers is a national non-profit organization that advocates policy positions related to LGBTQ+ rights and interests. As relevant here, Gays Against Groomers opposes the use of concepts like misgendering and deadnaming. Gays Against Groomers has an active Colorado chapter that is headed by Rich Guggenheim. Rocky Mountain Women's Network is an unincorporated association of members who advocate policy positions related to women's rights. As relevant here, the Network shares Gays Against Groomers' opposition to the use of concepts like misgendering and deadnaming. Christina Goeke co-founded the Network and is an active Colorado member.

Mike Weissman, Lorena Garcia, and Leslie Herod are Colorado State Representatives. Representative Weissman is the Chair of the House Judiciary Committee, while Representatives Garcia and Herod are members of the Committee. Julie Gonzales and Dafna Jenet are Colorado State Senators. Senator Gonzales is the Chair of the Senate Judiciary Committee and Senator Jenet is a member of the Committee. The legislative body they serve, the Colorado General Assembly, provides citizens with an opportunity to speak at public hearings on pending legislation. These public hearings are regulated by House and Senate rules

that authorize the committee chairs to remove people who are "impeding, disrupting, or hindering a committee meeting." Guide to Public Hearings, Colo. Gen. Assembly House of Representatives, https://perma.cc/5L6L-GRBQ; Guide to Public Hearings, Colo. Gen. Assembly Senate, https://perma.cc/DGU2-WYCX.[2]

During the 2024 session of the Assembly, the state legislature considered Tiara's Law.[3] Colorado law previously prohibited people who had been convicted of a felony from changing their legal name except for "good cause." Colo. Rev. Stat. § 13-15-101 (West 2024). As introduced in the House Judiciary Committee, the bill that became Tiara's Law sought to clarify that good cause exists when a change in legal name is sought to conform a person's name with their gender identity. H.B. 24-1071 § 1, 74th Gen. Assemb., 2d Reg. Sess. (Colo. Jan. 10, 2024). The bill was later amended to permit courts to require publication of a requested gender-affirming name change when it is sought by someone who has been convicted of a felony. *Id.*

---

[2] GAG refers to these permalinks in their complaint, and we are free to consider documents that are central to the plaintiffs' claims and referred to in the complaint. *White v. Lucero*, 135 F.4th 1213, 1219 (10th Cir. 2025) (quoting *Utah Gospel Mission v. Salt Lake City Corp.*, 425 F.3d 1249, 1253–54 (10th Cir. 2005)).

[3] Tiara's Law is referred to throughout GAG's complaint. Again, we are free to consider the bill as proposed and enacted since GAG referred to it in their complaint. *White*, 135 F.4th at 1219.

§ 2 (Feb. 23, 2024). The bill as amended was ultimately passed by the House and Senate of the Colorado General Assembly, signed by Governor Jared Polis, and codified at Section 13-15-101 of the Colorado Revised Statutes. 2024 Colo. Legis. Serv. 348 (West). But prior to passage and over the course of its legislative life, each chamber of the Assembly scheduled public hearings to consider the bill in their respective judiciary committees. Guggenheim and Goeke both sought to speak at these hearings.

On January 30, the Colorado House Judiciary Committee convened to hear public testimony on the bill. Defendant Rep. Garcia addressed the chair and thanked her colleagues for "not using derogatory language or misgendering witnesses, or using a witness's deadname." J. App. at 25.[4] She expressed "hope that the witnesses signed up to also testify will follow suit, and engage in respectful discourse and share their perspectives and

---

[4] The complaint alleges that this statement came from Defendant Sen. Gonzales. But Sen. Gonzales is not a member of the House Judiciary Committee, and elsewhere, the complaint refers to Rep. Garcia's closing statement at the end of the hearing. We think this is a scrivener's error, and since it neither requires extrinsic evidence nor prejudices the parties to take notice of the error, we need not accept the error as true under Rule 12(b)(6). *Cf. Peterson v. Martinez*, 707 F.3d 1197, 1206 (10th Cir. 2013) ("[F]actual allegations that contradict . . . a properly considered document are not well-pleaded facts that the court must accept as true." (second alteration in original) (citation omitted)). Here, the naming errors contradict the complaint itself and the documents referred to by the complaint, all properly considered documents. *White*, 135 F.4th at 1219. For the remainder of this opinion, we overlook such errors.

opinions on this bill by not disparaging other members or our community or other witnesses." *Id.* Defendant Rep. Weissman, as Committee Chair, "affirm[ed] and ratif[ied]" these comments. *Id.*

Guggenheim declined to testify under these conditions. Goeke, however, proceeded to testify. During her testimony, she described Tiara Kelley – the transgender woman after whom the bill is colloquially named – as "an admitted former prostitute." J. App. at 26. After she was interrupted by the Committee Chair and advised to keep her testimony "to the bill" and not "individual personalities," Goeke responded that discussion of Kelley was warranted because the "bill was literally named after him." J. App. at 26. Goeke's comments referred to Kelley using masculine pronouns and therefore misgendered her, contrary to the Committee's policy. After some further back and forth between Goeke and the Committee Chair, escalated cross-talk between several persons in the hearing room, and an interjection by Defendant Rep. Herrod, the Committee stopped Goeke's testimony and went into recess.

On March 27, the Colorado Senate Judiciary Committee also convened to hear public comments on Tiara's Law, where Goeke and Guggenheim again wished to speak. Defendant Sen. Gonzales, as Committee Chair, admonished witnesses that they would be removed "if they failed to exhibit decorum, dignity, or respect." J. App. at 29. Sen. Jenet

8

also stated that witnesses should not misgender or deadname others, and Sen. Gonzales agreed.

When it was Goeke's turn to speak, she attempted to refer to Tiara Kelley with masculine pronouns and a masculine name that Kelley had previously held. The Committee Chair interrupted her and reminded her of the rules that had been adopted at the onset of the hearing.[5] When Goeke insisted that she would continue to use masculine pronouns and a previous name to refer to Kelley, there was again some back and forth until the Chair stopped Goeke's commentary. Goeke alleges that her comments were later removed from the official audio recording of the Senate Judiciary Committee's hearing.

Later, it was Guggenheim's turn to speak. He attempted to explain his view that Marsha P. Johnson and Sylvia Rivera (two major LGBTQ+ rights activists during the Stonewall Era)[6] were not transgender women but rather gay men who were drag queens. After he was interrupted by the Committee Chair and reminded not to deadname or misgender people, he

---

[5] Again, this part of the complaint appears to mix up Rep. Garcia and Sen. Gonzales and we overlook these errors.

[6] For further explanation, *see generally* Kate Redburn, *Before Equal Protection: The Fall of Cross-Dressing Bans and the Transgender Legal Movement, 1963–86*, 40 L. & Hist. Rev. 679, 696 (2022).

attempted to explain his view that Marsha P. Johnson and Sylvia Rivera were not transgender and so he was not deadnaming or misgendering them. Because the microphones were off during this interchange, the Committee Chair could not hear him but allowed him to proceed after reminding him of the rules. He later attempted to describe Tiara Kelley as a gay man instead of a transgender woman, and the Committee Chair stopped his comments.

The Senate Judiciary Committee has continued to remind people who participate in legislative hearings on bills that touch on transgender rights and interests that misgendering and deadnaming are not permitted by the committee rules. And Goeke and Guggenheim both want to attend bill hearings and provide comments consistent with their beliefs. At oral argument, counsel for the Legislators affirmed that the Colorado General Assembly would continue to implement these rules going forward. Oral Arg. at 27:30.

## II

In April 2024, GAG filed their complaint against the Legislators. They alleged four claims for relief under 42 U.S.C. § 1983 and the U.S. Constitution's First and Fourteenth Amendments. First, they alleged that the committees' rules were impermissibly vague. Second, they alleged that the rules constitute viewpoint discrimination. Third, they alleged that the

erasure of Goeke's comments from the public record for violation of the rules constitutes viewpoint discrimination. Fourth, they alleged that the rules constitute compelled speech.[7] GAG also requested a preliminary injunction that would have barred enforcement of misgendering or deadnaming rules and restored Goeke's comments to the public record. Finally, GAG requested relief from the district court's local rules inviting "litigants, witnesses, and counsel to share their 'applicable pronouns'" and requiring all parties to refer "to all other persons by their . . . applicable pronouns." J. App. at 165 (alteration in original) (citation omitted).

The Legislators moved to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(6), arguing that they were entitled to absolute immunity, that GAG's claims failed on the merits, and that their requests for relief were moot. The Legislators also opposed GAG's motion for a preliminary injunction, largely on the same grounds. The Legislators chose to "defer" to the district court with respect to GAG's request for relief from the local practice rule because it was unclear how, in a lawsuit against the

---

[7] The concurrence concludes that GAG *only* challenged the enforcement of the decorum rules. Concurrence at 1. Although the complaint certainly challenged enforcement, it also challenged promulgation of the rules, as most evident by the complaint's self-described facial challenge to the rules themselves. *See, e.g.,* J. App. at 36 (second claim for relief).

Legislators, application of the local rule would become an issue. J. App. at 194–95.

After the parties' motions were fully briefed, the district court granted the Legislators' motion to dismiss. The district court held that the challenged committee rules and conduct were "within the sphere of legitimate legislative activity," and so the Legislators were entitled to absolute legislative immunity. J. App. at 243. The district court held that even if the Legislators were not entitled to legislative immunity, however, GAG's requests for relief were moot because it was speculative that the challenged rules would be applied to GAG again after the conclusion of the General Assembly's session. With the complaint dismissed, the district court also denied as moot GAG's motions for a preliminary injunction and relief from the local practice rules. The district court entered final judgment, and this timely appeal followed.

### III

Generally, federal courts may "choose among threshold grounds for denying audience to a case on the merits." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999). Here, because the district court addressed both mootness and legislative immunity, we do as well.

First, we conclude that GAG's requests for relief under 42 U.S.C. § 1983 are not moot. GAG's request for nominal damages is not moot because

12

it is at least partially retrospective. And GAG's request for injunctive and declaratory relief is not moot because the Legislators have not disclaimed an intent to engage in the challenged conduct again. Indeed, they have confirmed that the challenged conduct will continue. GAG is therefore subject to a future threat of injury and the case remains a live controversy.

Second, we hold that GAG's claims are barred by legislative immunity. Legislative immunity is available to the members of a legislative body regardless of whether a lawsuit is styled as an "official capacity" or "individual capacity" suit. And the establishment and enforcement of rules of decorum for legislative proceedings fall within the sphere of legitimate legislative activity. The Legislators are therefore entitled to legislative immunity and GAG's claims cannot proceed. We therefore affirm the district court's judgment.

## A

Under Article III of the Constitution, federal courts may decide only "cases" or "controversies." U.S. Const. art. III, § 2. A case or controversy is a live dispute between adverse parties over some concrete interest. *Prison Legal News v. Federal Bureau of Prisons*, 944 F.3d 868, 879 (10th Cir. 2019). A party seeking federal judicial relief must therefore demonstrate the "irreducible constitutional minimum" for the existence of a case or controversy: an injury-in-fact, traceable to the opposing party and

13

redressable by a favorable decision of the court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). "An actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." *Brown v. Buhman*, 822 F.3d 1151, 1165 (10th Cir. 2016) (citation omitted). "If an intervening circumstance deprives the plaintiff of a personal stake in the outcome of the lawsuit, at any point during litigation," the case becomes moot, and with few exceptions, there is no controversy for a federal court to decide. *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 72 (2013) (citation and internal quotation marks omitted); *Buhman*, 822 F.3d at 1166–68 (discussing major exceptions). "Mootness deprives federal courts of jurisdiction." *Buhman*, 822 F.3d at 1165.

The requirements of Article III are "not dispensed in gross." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021). We assess mootness as to "each form of relief sought." *Prison Legal News*, 944 F.3d at 880 (citation omitted). Requests for retrospective relief (like damages) rarely become moot. Past injuries are not susceptible to alteration. Thus, "so long as the plaintiff has a cause of action for damages," the case remains live. *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dept. of Health and Human Resources*, 532 U.S. 598, 608–09 (2001). Requests for prospective relief (like injunctions) become moot when the party seeking relief is no longer subject to a future threat of injury. Thus, a request for an "injunction

14

becomes moot once the event to be enjoined has come and gone." *Citizen Center v. Gessler*, 770 F.3d 900, 907 (10th Cir. 2014). Likewise, a request for a declaratory judgment becomes moot when the requested judgment no longer "affects the behavior of the defendant toward the plaintiff." *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1110 (10th Cir. 2010).

In general, we do not consider the merits of a plaintiff's claims for the purposes of assessing our Article III jurisdiction. *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1092–93 (10th Cir. 2006) (en banc). With respect to First Amendment claims for prospective relief, which raise unique forms of injury, we apply a disciplined framework for evaluating standing and mootness to properly divorce our assessment of jurisdiction from our review of the merits. Our cases establish that a plaintiff who intends to engage in arguably protected conduct that is covered by the challenged governmental action and who faces a credible threat of enforcement has standing to bring a claim. *Ward v. Utah*, 321 F.3d 1263, 1267 (10th Cir. 2003). Generally, past enforcement, the widespread authority to enforce, and disavowal of future enforcement are all factors we take into consideration when evaluating whether a plaintiff faces a credible threat of enforcement. *Peck v. McCann*, 43 F.4th 1116, 1132 (10th Cir. 2022).

15

Here, as the district court acknowledged, GAG's request for nominal damages is at least partially retrospective, and so it is not moot. *Uzuegbunam v. Precsewski*, 592 U.S. 279, 292–93 (2021). We disagree with the district court, however, insofar as it found GAG's request for prospective relief moot. The Legislators have previously enforced the challenged rules against GAG. GAG intends to continue to misgender and deadname individuals in comments at the Colorado General Assembly. And counsel for the Legislators confirmed they intend to enforce rules against misgendering or deadnaming in the future. Oral Arg. at 27:30. GAG clears what we have said "is not supposed to be a difficult bar for plaintiffs to clear in the First Amendment pre-enforcement context." *Peck*, 43 F.4th at 1133. This case is not moot.

**B**

We turn now to a discussion of the alternative threshold basis upon which the district court dismissed this case: legislative immunity. We begin by recounting the general statutory framework from which this doctrine was born.

The enforcement of constitutional rights against state officials is largely a consequence of the Civil Rights Act of 1871, which authorizes wide access to relief for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C.

16

§ 1983. The Supreme Court has given § 1983 a broad construction in light of its remedial purpose. *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 685 (1978). Still, the reach of § 1983 is not unlimited. The Court has long assumed that the unadorned text of § 1983 incorporates background rules of liability and immunity that mark the law's outer boundaries. *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976) (reading § 1983 "in harmony with general principles of tort immunities and defenses rather than in derogation of them"). Thus, for example, municipalities are liable for constitutional violations only insofar as they directly "cause" a constitutional violation, not for the violations of their employees. *Monell*, 436 U.S. at 692. States are not "persons" subject to suit under § 1983. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71 (1989). Police officers are entitled to limited immunity from suit for actions taken in good faith. *Harlow v. Fitzgerald*, 457 U.S. 800, 806 (1982). And in some cases, it is assumed that Congress intended no relief whatsoever, entitling the defendant to absolute immunity from suit. *Id.* at 807.

Legislators, exercising their legislative functions, are among those defendants entitled to absolute immunity. *Id.* In the landmark case *Tenney v. Brandhove*, the Supreme Court rejected the constitutional challenge of a plaintiff who had been summoned by the California Senate's Committee on Un-American Activities, allegedly in retaliation for a petition he had

17

circulated advocating against the committee. 341 U.S. 367, 370–72 (1951). The Court traced the historic roots of the "privilege of legislators to be free from arrest or civil process for what they do or say in legislative proceedings" all the way back to the English Bill of Rights. *Id.* at 372. "We cannot believe," explained the Court, "that Congress – itself a staunch advocate of legislative freedom – would impinge on a tradition so well grounded in history and reason by covert inclusion in the general language" of § 1983. *Id.* at 376. Thus, the conduct of legislators that is within "the sphere of legitimate legislative activity" is absolutely immune from judicial inquiry. *Id.*; *see also Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 503–05 (1975) (discussing the scope of legitimate legislative activity); *Harlow*, 457 U.S. at 807 ("The absolute immunity of legislators, in their legislative functions, . . . now is well settled." (citations omitted)).

This legislative immunity extends not only to damages suits, but also to requests for injunctive or declaratory relief. The Supreme Court held in *Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, that although "*Tenney* involved an action for damages under § 1983, its holding is equally applicable to § 1983 actions seeking declaratory or injunctive relief." 446 U.S. 719, 732 (1980). The Court explained that *Tenney* did not by its own terms "distinguish between actions for damages and those for prospective relief." *Id.* at 733. And reading such a distinction into *Tenney* would

18

undermine the very policy concerns that justified the *Tenney* doctrine: the risk that civil liability would "create a distraction and force legislators to divert their time, energy, and attention from their legislative tasks to defend the litigation." *Id.* (citation modified) (quoting *Eastland*, 421 U.S. at 503).

In the district court, the Legislators asserted absolute immunity in their motion to dismiss and their response to GAG's motion for a preliminary injunction. They argued that "everything occurred wholly within the context of two formal legislative committee meetings convened specifically and exclusively for the purpose of obtaining public comment on the merits of a piece of pending legislation – and for no other purpose." J. App. at 180. This, the Legislators argued, is wholly within the ambit of absolute legislative immunity.

In response, GAG argued that "legislative immunity is a *personal* defense not applicable to official-capacity claims for declaratory and injunctive relief." J. App. at 199. Additionally, GAG argued that the Legislators' enforcement activity – namely their termination of the individual GAG plaintiffs' time for comment and the removal of Goeke's comments from the public record – is not entitled to legislative immunity. Finally, GAG pressed that administering "censorship" at public hearings is not protected by legislative immunity. J. App. at 202.

19

The district court rejected GAG's arguments down the line. First, the district court explained that while the nature of the suit as an official capacity suit may be relevant for sovereign immunity purposes, it did not defeat the applicability of the "completely distinct" legislative immunity doctrine. J. App. at 237. Second, the district court held that the Legislators' conduct was sufficiently related to the "legislative function of overseeing public testimony on pending legislation and gathering relevant information and input from the public" to warrant absolute legislative immunity. J. App. at 242. The district court therefore granted the Legislators' motion to dismiss.

On legislative immunity, we agree with the district court. First, the district court was correct to disregard the distinction between official capacity and individual or personal capacity suits for the purposes of absolute legislative immunity. Legislative immunity remains available to legislators acting within their legislative capacity regardless of whether they are sued in their individual or official capacity. Second, the Legislators' conduct here – both the adoption of the misgendering and deadnaming rules as well as the implementation of those rules within the context of legislative hearings – falls within the sphere of legitimate legislative activity.

**1**

As we previously observed, states themselves are not proper subjects of § 1983 lawsuits. *Will*, 491 U.S. at 67. This is because, as the Supreme Court has explained, Congress did not intend to override the states' historic, well-rooted, and structurally vital entitlement to sovereign immunity from suit, reflected in the Eleventh Amendment. *Id.*; *Hans v. Louisiana*, 134 U.S. 1, 10 (1890).[8] But because all sovereigns operate through the actions of their officers, it has likewise been long understood that state officials are also entitled to the benefit of sovereign immunity as arms of the state. *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). Sovereign immunity would be meaningless otherwise. Thus, "a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office[.] As such, it is no different from a suit against the State itself." *Will*, 491 U.S. at 71 (internal citation omitted). Such suits are ordinarily barred by sovereign immunity.

The major and relevant exception to this rule is that suits for prospective relief against officials, acting in their official capacity, are not barred by sovereign immunity. *Id.* at 71 n.10. "[O]fficial-capacity actions for

---

[8] Of course, as the Supreme Court simultaneously observed, Congress "undoubtedly" could override the states' sovereign immunity pursuant to its power under § 5 of the Fourteenth Amendment to enforce constitutional protections. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 66 (1989).

21

prospective relief are not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). Since the seminal case *Ex Parte Young*, federal courts have exercised the power to adjudicate requests for prospective relief against state officials acting in their official capacity for well over a century. 209 U.S. 123 (1908). But while this exception to the usual rule of sovereign immunity is important and often deployed in the context of constitutional challenges, it also has limits. In *Whole Woman's Health v. Jackson*, for example, the Supreme Court declined to extend the scope of *Ex Parte Young* to permit injunctive relief against state court judges and their clerks because to do so "would be a violation of the whole scheme of our Government." 595 U.S. 30, 39 (2021) (quoting *Ex Parte Young*, 209 U.S. at 163); *see also id.* at 42 (distinguishing *Pulliam v. Allen*, 466 U.S. 522 (1984), as addressing the "distinct doctrine of judicial immunity").

Like the district court, we do not understand the *Ex Parte Young* exception to authorize injunctions against state legislators acting in their legislative capacity. To begin with, the scope of *Ex Parte Young* is generally construed in light of historic equitable traditions, which, like § 1983, incorporate the principle of legislative immunity. *Cf. id.* at 39 (examining interaction between *Ex Parte Young* and historic tradition against enjoining judges).

22

Additionally, § 1983 and *Ex Parte Young* are distinct sources of liability and immunity. Legislators are "absolutely immune from liability under § 1983 for their official acts because that immunity was well established at common law in 1871," *Ziglar v. Abassi*, 582 U.S. 120, 157 (2017) (Thomas, J., concurring in part), whereas *Ex Parte Young* is an exception to Eleventh Amendment sovereign immunity. As the district court noted, the fact that the Eleventh Amendment may not protect the Legislators from injunctive relief tells us nothing about whether they are liable under § 1983. And here, the Supreme Court's decision in *Consumers Union* resolves the latter question: "[a]lthough *Tenney* involved an action for damages under § 1983, its holding is equally applicable to § 1983 actions seeking declaratory or injunctive relief." 446 U.S. at 732; *see also* Erwin Chemerinsky, *Absolute Immunity: General Principles and Recent Developments*, 24 Touro L. Rev. 473, 476 (2008) ("Also, legislators have absolute immunity for injunctions for legislative functions."). Thus, whether legislative officials are sued in their official or individual capacity, whether the relief sought is prospective or retrospective, so long as they are sued for their exercise of a legislative function, they are entitled to absolute legislative immunity.

GAG resists this conclusion by pointing to one of our prior cases, *Sable v. Myers*, 563 F.3d 1120 (10th Cir. 2009). In *Sable*, we considered an

23

individual's claim that a decision by a local government body to condemn his property was made in violation of the First Amendment. *Id.* at 1123. He sued city council members for damages, and the city council members raised legislative immunity as a defense. *Id.* The district court rejected the defense of absolute immunity, and we reversed. *Id.* at 1123, 1127. We applied a "broad view of legislative immunity" and held that the relevant conduct fell within the scope of legitimate legislative activity. *Id.* at 1125–26. We did not address the kind of argument that GAG raises here.

Nonetheless, GAG points to our statement that legislative immunity applies "only to legislators sued in their individual capacities, not to the legislative body itself" to authorize injunctions against legislators. *Id.* at 1123. We think this one sentence is far too thin a reed upon which to rest so heavy an argument. We do not read this language in *Sable* as addressing a distinction between official capacity claims and individual or personal capacity claims.

Instead, the *Sable* court was clarifying that while "individual" legislators are entitled to absolute immunity under § 1983, entities that are not natural persons (or individuals in the colloquial sense) like state agencies or local bodies must rely on some other doctrine of liability or immunity to defend themselves. *See, e.g.*, *Monell*, 436 U.S. at 694 (municipalities not liable under theories of respondeat superior); *Mt.*

24

*Healthy*, 429 U.S. at 280 (arms of the state are entitled to sovereign immunity). Indeed, the sentence from *Sable* that GAG relies upon cites to a Fifth Circuit case, *Minton v. St. Bernard Parish Sch. Bd.*, that makes this same point. 803 F.2d 129, 133 (5th Cir. 1986). Further, in *Sable*, we consoled the losing plaintiff-appellee by pointing out that although we had rejected his attempt to hold city council members individually liable, the city itself might have been "subject to suit under § 1983." 563 F.3d at 1127.

If we were to read this one sentence in *Sable* any other way, we would functionally upend the doctrine of legislative immunity and the interests it protects. Recall that GAG is not arguing at this juncture that the Legislators' conduct falls outside the scope of legislative immunity, but that legislative immunity does not apply *at all* to GAG's request for injunctive or declaratory relief. GAG's theory lacks any limiting principle. It would permit a legislator to be enjoined from voting for a particular piece of legislation, based on a federal court's ex ante view that the unenacted bill is unconstitutional, even though voting for the bill is quintessentially legislative, solely because the plaintiff sought an injunction rather than damages. We think such extreme possibilities were far outside the scope of issues decided in *Sable*, and we foreclose such possibilities today. We thus join all our sister circuits that have considered the issue in holding that prospective relief is not available against a legislative official performing a

25

legislative function. *Cushing v. Packard*, 30 F.4th 27, 39–40 (1st Cir. 2022); *State Emps. Bargaining Agent Coal. v. Rowland*, 494 F.3d 71, 82–88 (2d Cir. 2007); *Scott v. Taylor*, 405 F.3d 1251, 1255 n.6 (11th Cir. 2005). GAG points us to no contrary authority.

GAG instead relies on several isolated statements by the Supreme Court reiterating that personal defenses are only available to a defendant sued in their personal, not official, capacity. *Graham*, 473 U.S. at 167; *Hafer v. Melo*, 502 U.S. 21, 25 (1991); *Board of County Commissioners v. Umbehr*, 518 U.S. 668, 677 n.* (1996). But GAG takes these statements out of their relevant context. *Graham* involved attorneys' fees under 42 U.S.C. § 1988 in personal-capacity actions. 473 U.S. at 161. *Hafer* addressed whether state officials are "persons" within the meaning of § 1983. 502 U.S. at 23. And *Umbehr* was a case involving local government officials who were not explicitly understood to benefit from legislative immunity until two years later. *Compare* 518 U.S. at 677 n.* (1996), *with Bogan v. Scott-Harris*, 523 U.S. 44, 52–54 (1998). Together, although these cases involved some distinction between official and personal capacity actions, none of them squarely addressed absolute immunity, much less legislative immunity, and even less so whether legislative immunity remains available in an official capacity suit for prospective relief.

On this point, we find persuasive the First Circuit's explanation in *Cushing* that *Consumers Union* foreclosed suits for prospective relief against legislators acting in their official capacity. *Cushing*, 30 F.4th at 39. Although the Supreme Court did not use the term "official capacity," the Venn diagram of official-capacity suits versus suits for prospective relief is essentially a circle. *Id.* ("Against this backdrop, we fail to see why we must treat the plaintiffs' claims . . . as if they are not what they purport to be[.]"). So we can safely conclude that, because the distinction between official and personal capacity suits was still nascent at the time *Consumers Union* was decided, *see Graham*, 473 U.S. at 165, the Supreme Court intended the legislative immunity doctrine to apply howsoever the case is captioned.

The Court's subsequent dicta in the varied contexts argued by GAG is insufficient to relieve us of applying the more specific and controlling holding of *Consumers Union*.[9] Any argued or perceived inconsistency between *Consumers Union* and the Supreme Court's other cases is for the Supreme Court to clarify, not us. *Rodriguez de Quijas v. Shearson/American Exp., Inc.*, 490 U.S. 477, 484 (1989) ("If a precedent of

---

[9] *Graham* approvingly cited and discussed *Consumers Union* in one part of its opinion, but did not acknowledge it at all in the part of the opinion that GAG relies most heavily on. *Kentucky v. Graham*, 473 U.S. 159, 164, 167 (1985). It would be an extraordinary interpretation of *Graham*, then, to read it as implicitly overturning *Consumers Union*.

this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

Distinguishing between official capacity and personal capacity suits for the purposes of legislative immunity would eviscerate the Supreme Court's holding in *Consumers Union*. Lacking the authority to do this, we hold that legislative immunity is available to legislators acting in their

legislative capacity, regardless of the relief sought or the nature of the suit.[10]

2

Having decided that legislative immunity is available to legislators sued in either their individual or official capacities, we now turn to whether it applies to the Legislators here. The applicability of legislative immunity "turns on the nature of the act, rather than on the motive or intent of the

---

[10] Our holding today is limited to the interpretation of § 1983 and whether the doctrine of absolute legislative immunity that has been implicitly codified in that statute authorizes prospective relief. We do not address other civil rights remedies that Congress has provided, each of which has their own interpretative jurisprudence. *See, e.g.*, *Guttman v. Khalsa*, 669 F.3d 1101 (10th Cir. 2012) (addressing claim arising under the Americans with Disabilities Act). Thus, while we cite approvingly the First Circuit's decision in *Cushing v. Packard*, 30 F.4th 27 (1st Cir. 2022) (en banc), our discussion of that case should not be read to adopt wholesale its ultimate holding that legislative immunity forecloses relief under the ADA.

Likewise, our holding today does not disturb the accepted wisdom of permitting federal courts to inquire into legislative motive where appropriate and where the relief sought is not against the legislators themselves, subject to a separate legal framework. *See, e.g.*, *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 268 (1977) ("In some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege."); *see also Jefferson Community Health Care Centers, Inc. v. Jefferson Parish Government*, 849 F.3d 615, 624 (5th Cir. 2017) ("While the common-law legislative immunity for state legislators is absolute, the legislative privilege for state lawmakers is, at best, one which is qualified." (internal quotation marks and citation omitted)).

official performing it." *Bogan*, 523 U.S. at 54. In *Bogan*, the Court identified several nonexhaustive factors for identifying immunized legislative activity, like the "discretionary, policymaking" nature of the act, the "prospective implications" of the act, and whether the act occurred "in a field where legislators traditionally have power to act." *Id.* at 55–56. Moreover, the Supreme Court has extended legislative immunity to officials who are not themselves legislators so long as the suit seeks relief against the exercise of legislative power, underscoring that it is function, not person, that confers immunity. *Consumers Union*, 446 U.S. at 731–34. Thus, the Court has held that voting in favor or against legislation is "in form, quintessentially legislative." *Bogan*, 523 U.S. at 55. An executive official who formally introduces legislation is entitled to legislative immunity, even though she is not a member of the legislative branch. *Id.* And "[i]nvestigations, whether by standing or special committees, are an established part of representative government," and so officials are entitled to legislative immunity for acts done in furtherance of legislative fact-finding. *Tenney*, 341 U.S. at 377.

We conclude that these precedents dictate that both the Legislators' adoption and their enforcement of the committee rules are within the sphere of legitimate legislative activity.

30

With respect to the adoption of the committee rules, we set aside GAG's argument and allegations that the rules are unconstitutional, unlawful, or improper. Instead, we ask whether the adoption of these particular rules, like other committee rules, falls within the broad legislative tradition. We conclude that it does.

The promulgation of these rules was the exercise of a "discretionary, policymaking" function. The rules are also prospective in that they apply to a broad set of people and commentors, not just the plaintiffs-appellants here, and will continue to do so. *Cf. Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915) (identifying the general nature of a "rule of conduct" that "applies to more than a few people" as a legislative characteristic). And the adoption of the rules occurred "in a field where legislators traditionally have power to act." *Bogan*, 523 U.S. at 56 (quoting *Tenney*, 341 U.S. at 379). "Investigations, whether by standing or special committees, are an established part of representative government," *Tenney*, 341 U.S. at 377, and as we understand its arguments, GAG never contests that legislatures must be able to adopt rules for those investigations. Historically, those rules have included wide-ranging prohibitions on honest,

protected expression.[11] The adoption of the rules "were legislative because they were integral steps in the legislative process." *Bogan*, 523 U.S. at 55.

It follows, as night the day, that in the circumstances here, the Legislators' enforcement of the committees' rules was also a quintessential legislative activity. The entire purpose of adopting committee rules was to govern conduct at legislative hearings. That adoption would be meaningless if legislators, as the ones overseeing such hearings, could not enforce those rules in the very forum they were designed for. If *Tenney* upheld the use of the subpoena power to compel attendance to the California Legislature's committee hearings, we cannot see how the Colorado Legislators' much more limited actions here – ending the speaking time early for certain speakers and allegedly removing certain comments from the legislative record – can be denied the benefit of legislative immunity consistent with *Tenney*.

GAG relies principally on *Consumers Union*, where the Supreme Court did draw a distinction between the Supreme Court of Virginia's

---

[11] Thus, for example, a member of Congress that calls a colleague a liar, a hypocrite, or a racist might engage in protected expression, but they may also violate long-standing rules on decorum. *See, e.g.*, Gail E. Baitinger, *Words Taken Down: Calling Members to Order for Disorderly Language in the House*, Cong. Rsch. Serv. at 7–22 (Aug. 13, 2019), *available at* https://www.congress.gov/crs-product/R45866#_Toc16776221 (tables of historic examples of rules violations in the U.S. House).

adoption of disciplinary rules (immune) and enforcement of them (not immune). 446 U.S. at 734–37. The Court drew this distinction to implement the contours of legislative immunity: a legislator is immune for actions taken within the sphere of legislative activity, but enforcement is generally an executive, not legislative function. But we do not think this distinction stands for the broad proposition that GAG argues we should adopt.

The *Consumers Union* distinction reflects the fact that state and local bodies, free from the constraints of federal separation of powers principles, can and often do exercise mixed legislative, judicial, and executive functions. But the Supreme Court has repeatedly explained – indeed, nearly all of federal administrative law is based on this explanation – that a function can look legislative, but still be essentially executive. *See, e.g.*, *Whitman v. American Trucking Associations*, 531 U.S. 457, 475 (2001). Likewise, an action that looks executive may in fact be legislative. *Cf. Trump v. Mazars USA, LLP*, 591 U.S. 848, 862–63 (2020) (distinguishing between legitimate Congressional subpoenas for a "valid legislative purpose" and illegitimate Congressional subpoenas for law enforcement purposes).

As above, so below: *Consumers Union* does no more than apply this federal principle to the state legislative immunity context. Just as the federal principle allows Congress to impose certain penalties for violating

its legislative rules without finding that Congress has impermissibly exercised executive power, so too does the doctrine of legislative immunity permit state legislatures to impose certain limited, historically applied remedies for violating committee rules.

Taking each of GAG's allegations of impermissible enforcement separately – the early termination of time to speak at a legislative hearing and removal of comments from the official legislative record – we believe each is amply insulated from judicial scrutiny. The legislature's time is its own. The Legislators' interruption of and early termination of Goeke and Guggenheim's time to speak no more exceeded the legislative function than a judge exceeds the judicial function by interrupting or cutting off counsel during oral argument.

Similarly, the legislature is entitled to decide how its proceedings are officially recorded, and the penalties imposed here appear *uniquely* legislative. We would not expect to find Colorado executive and judicial officers injecting themselves into the legislative process to decide who speaks for how long and what goes into the legislative record. Those decisions belong peculiarly to members of the Colorado General Assembly. The Legislators are therefore entitled to absolute immunity for enforcing the committee rules at the hearings those rules were meant to govern, as they did here.

34

This might have been a different case if the Legislators were empowered to seek civil damages, conduct criminal prosecution, *see Kilbourn v. Thompson*, 103 U.S. 168 (1880), or ban the plaintiffs from ever speaking at the Colorado General Assembly again. This latter example was the case in *Kamplain v. Curry County Board of Commissioners*, another case that GAG relies upon. 159 F.3d 1248 (10th Cir. 1998).

In *Kamplain*, we held that a county board's "ban of Plaintiff from attending Commission meetings and its subsequent decision to prohibit Plaintiff from speaking at or participating in meetings were administrative acts" not entitled to legislative immunity. *Id.* at 1252. The breadth of this penalty, unconnected from the investigation of any particular issue, led us to conclude that it was fundamentally non-legislative because legislatures do not ordinarily exercise such broad power to punish. *Id.* But we specifically disclaimed any ruling on "the Board's ejection of Plaintiff from the public meeting," a narrower and more particularized form of enforcement. *Id.* We think the Legislators' actions here are much narrower than those at issue in *Kamplain* and therefore within the scope of legislative

immunity.[12] We could not reconcile *Kamplain* with *Tenney* if we were to conclude otherwise.

## IV

When *Tenney* was decided well over half a century ago, Justice Douglas foresaw that it could have unseemly applications. 341 U.S. at 383 (Douglas, J., dissenting) ("Yet now we hold that no matter the extremes to which a legislative committee may go it is not answerable to an injured party under the civil rights legislation."). But the Supreme Court perceived powerful reasons to shield the legislative process from judicial inquiry nonetheless: more than merely the risk of distracting legislators from their duties, fundamental principles of federalism and the separation of powers were key to the outcome in *Tenney*. *Id.* at 377 (it is "not consonant with our scheme of government for a court to inquire into the motives of legislators"). We faithfully apply those principles today.

---

[12] Like the concurrence, we apply a distinction between promulgation and enforcement for the purposes of legislative immunity. We do not hold, however, that immunity for enforcement actions automatically or always follows from immunity for other acts. Concurrence at 3. We hold only that the narrow enforcement actions alleged here are sufficiently legislative in character that they fall within the scope of the immunity doctrine. Per the *Bogan* factors, what matters is whether the nature of the action (enforcement or otherwise) is such that it is no longer legislative. But if that analysis reveals a legislative act, the defendants are entitled to absolute immunity and the curtain must fall on the plaintiffs' case.

The legislative process is inherently political, and therefore not easily amenable to federal judicial inquiry. People injured by this process are generally not free to sue legislators for their legislative acts. "Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." *Bi-Metallic*, 239 U.S. at 445. The doctrine of legislative immunity forecloses our inquiry into the merits of the Legislators' actions here, and so the district court's judgment is AFFIRMED. Because we affirm the district court's dismissal of GAG's complaint, we likewise affirm the district court's denial of GAG's motions for a preliminary injunction and relief from the local rules on mootness grounds.[13]

---

[13] We are unsure by what device, if any, we are empowered to review the district court's local practice rules. GAG's appeal from the denial of its motion for relief from the local rules might well be susceptible to dismissal, rather than affirmance. But since we may "choose among threshold grounds for denying audience" to this aspect of the appeal, *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 585 (1999), we think it simpler to affirm on mootness grounds. Our affirmance should not be read to indicate, however, that the appeal of that issue is properly before us.

Gays Against Groomers v. Garcia, No. 24-1473

**CARSON**, Circuit Judge, concurring in parts II, III-A and III-B-1 and concurring in the judgment:

Although the founders created our divided system of government with checks and balances in mind, they did not design the system for federal courts to police the internal workings of legislatures—state or federal.  And this case at its core involves the internal workings of a state legislature.  For that reason, I agree with the majority that, in this case, the legislators have immunity.  But I cannot join the majority opinion in its entirety.

The heart of this case is the distinction between *enforcing* rules of decorum and *promulgating* rules of decorum.  The majority begins its opinion by saying that "GAG alleged that the Legislators violated their First Amendment rights by promulgating and enforcing rules of decorum that barred misgendering and deadnaming in legislative hearings."  I read the Complaint differently.  Although Plaintiffs certainly took issue with the content of the rules, the Complaint's various causes of action alleged the Legislators violated their constitutional rights by enforcing, *not* by promulgating, the rules of decorum.  And that distinction matters.

Whether we extend legislative immunity depends on the nature of the action undertaken.  Importantly, this analysis is granular enough to capture distinctions in actions involving the same legislative acts—including the difference between promulgating and enforcing a legislative act.  We see this in multiple legislative immunity cases.  See Gravel v. United States, 408 U.S. 606, 618–22 (1972) (discussing cases).

1

For instance, in Kilbourn v. Thompson, the "House Members who had adopted a resolution authorizing" an arrest received legislative immunity, yet "the resolution was subject to judicial review insofar as its execution impinged on a citizen's rights." Id. at 618 (discussing Kilbourn v. Thompson, 103 U.S. 168 (1881)). Similarly, in Dombrowski v. Eastland, legislative immunity protected a subcommittee chairman who sought to obtain records for a committee proceeding, but not the committee counsel involved in "carry[ing] out an illegal seizure of" those records. Id. at 619 (citing Dombrowski v. Eastland, 387 U.S. 82, 84 (1967)). And in Powell v. McCormack the Court extended immunity to House Members who enacted an "illegal legislative act" that excluded a representative-elect, yet the Court "afford[ed] relief against House aides seeking to implement" those acts. Id. at 620 (discussing Powell v. McCormack, 395 U.S. 486 (1969)).[1]

As the Court explained, these differential grants of immunity between promulgating and executing legislative acts "reflect[] a decidedly jaundiced view towards extending [immunity] so as to privilege illegal or unconstitutional conduct beyond that

---

[1] Each of these cases involves federal officials subject to the Speech or Debate Clause of the Constitution, see Kilbourn, 103 U.S. at 204; Dombrowski, 387 U.S. at 83; Powell, 395 U.S. at 501–06, which mandates that "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art I, § 6. Although the Speech or Debate Clause does not apply to state legislators, see Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency, 440 U.S. 391, 404–05 (1979), their "common-law immunity from liability" is "similar in origin and rationale." Sup. Ct. of Va. v. Consumers Union of U.S., Inc., 446 U.S. 719, 731–32 (1980). These cases are relevant to the state legislative immunity at issue here, then, because this immunity "for purposes of § 1983 has been patterned after immunity under the Speech or Debate Clause." Dennis v. Sparks, 449 U.S. 24, 30 (1980) (citing Consumers Union, 446 U.S. at 732–34).

2

essential to foreclose executive [or judicial] control of legislative speech or debate and associated matters . . . ." Id. at 620. It does not matter that "protecting the rights of others may . . . to some extent frustrate[] a planned or completed legislative act," what matters is whether a court can provide judicial relief from the unconstitutional conduct "without proof of a legislative act or the motives or purposes underlying such an act" and without threatening legislative independence. Id. at 621.

Under this case law, the majority's reasoning that legislative immunity extends to the enforcement of the challenged rule because a rule's adoption is meaningless "if legislators, as the ones overseeing such hearings, could not enforce those rules in the very forum they were designed for" is unpersuasive. As an initial matter, this overstates the necessary result of permitting judicial review of legislative rules like the rule at issue here. Legislators would remain free to enforce rules that do not violate constitutional rights. And to the extent relief is afforded against a rule as-applied, legislators would remain free to enforce that rule as a general matter. But regardless, judicial review is available even where it may "frustrate[] a planned or completed legislative act." Gravel, 408 U.S. at 621. Legislative immunity protects legislative independence, Sup. Ct. of Va. v. Consumers Union of U.S., Inc., 446 U.S. 719, 731–32 (1980), it does not entitle legislators to the fruits of their unconstitutional conduct.[2]

---

[2] Plaintiff's Complaint demonstrates why judicial review in this case would require "proof of a legislative act or the motives or purposes underlying such an act" and threaten the Colorado legislature's independence in considering pending legislation before it. See Gravel, 408 U.S. at 621. The legislative rule at issue applies to "public comment on pending legislation." Plaintiffs would have us find that Defendants have "enforced the rule in a selective, subjective, and viewpoint-discriminatory manner," that

3

As discussed above, the Court permitted judicial review of the arrest in <u>Kilbourne</u> and the exclusion of the representative-elect in <u>Powell</u> even though relief rendered the protected—yet unconstitutional—legislative acts in those cases meaningless.  So too would judicial relief be available here if such relief did not interfere with legislative independence, regardless of whether relief would frustrate the protected, but potentially unconstitutional, promulgation of the legislative rule.  Thus, although I agree that legislative immunity applies to the enforcement actions in this case, I disagree with the majority opinion's suggestion that this immunity follows from the fact that the legislatively immune act would be meaningless if we did not allow for its unconstitutional enforcement.

In conclusion, this case is about whether a legislative body can, without being subject to suit, compel or prohibit speech when it allows commentary on pending legislation.  We conclude, as required by precedent, that it can.  But, make no mistake, the panel's opinion is far reaching.  The opinion allows legislative bodies to create rules under the guise of decorum that essentially silence opposition in legislative hearings.  Are

---

Defendants' "custom, policy, or practice" is to apply their decorum rule "in ways that discriminate against dissenters from trans ideology" and "compels citizens to mouth support for trans ideology," that the rule is "not designed to confine the forum to the limited and legitimate purpose for which it was created, but rather, to suppress ideologies and opinions," and that Defendants censored Plaintiffs in an "Orwellian fashion." Judicial review of Defendants' enforcement activity based on these allegations would necessitate an inquiry into the Defendants' motives in conducting a committee hearing on pending legislation.  Relief might require us to enjoin this activity based on Defendants' views on pending legislation.  Relief might also see us force the Colorado legislature to consider views and ideologies before voting on pending legislation.  Such inquiries and interventions into the legislative process pose too great a risk to legislative independence, requiring immunity in this case.

the people whose opinions are excluded in such an instance left with the ballot box as their only remedy?  Likely so.  Although it troubles me that a legislative body can effectively silence speech and leave the party whose speech is compelled or prohibited without a judicial remedy, the relevant authorities allow it.  And the result in favor of one viewpoint in this case will apply equally if a legislative body in another state flips the script and allows only the opposite viewpoint to be expressed in its hearings.  But the legislative immunity doctrine purposely imposes harsh consequences—even when a party would otherwise have a meritorious claim.

For these reasons, I respectfully concur in part and concur in the judgment.